*36 KNOLL, J.,
concurs in part and dissents in part. .
' hi agree fully with the Court’s Batson analysis and strongly believe that this defendant’s conviction and death sentence .could be vacated on that basis. However, I heartily disagree with the majority’s conclusion- that there was sufficient evidence under Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), to sustain defendant’s conviction for the first-degree murder of his infant son. AS' the majority recognizes, where the conviction is based on circumstantial evidence, the prosecution’s case must “exclude! ] every reasonable hypothesis of innocence.” State v. Captville, 448 So.2d 676, 678 (1984). Under Jackson, “the relevant question is-whether, after viewing the evidence in-the light most favorable to.the prosecution, any rational trier of fact could have found' the essential elements of the crime beyond a reasonable doubt.” 443 U.S. at 319, 99 S.Ct. at 2789. Indeed, the touchstone of this inquiry is reasonableness. If the jury’s verdict is not reasonable, the defendant’s conviction cannot be maintained. Considering all of the evidence in the light most favorable to the prosecution, no rational trier fact could have concluded that the State presented sufficient evidence to prove beyond a reasonable doubt that the defendant had the specific intent to. kill his one-year-old son or that the defendant killed the infant while he was engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree | acruelty to juveniles. M; La. Rev. Stat. 14:30(A)(1), (3). The State’s entire case rested on forensic pathologist Dr. James G. Traylor’s conclusion that the cause of the infant’s death was “smothering with the mechanism of death being asphyxia.” Indeed, during cross-examination, Dr. Traylor admitted, because none of the child’s other evident injuries caused his death (i.e., had “anything to do with smothering”), the only evidence that led him to this conclusion that the -infant was smothered was the abraded contusions on the undersides of the infant’s upper lip and lower lip:
Q. Now, Dr. Traylor—
A. Yes.
Q. —other than this picture right here— well, let me backtrack and rephrase. We’ve got all kind of evidence of possible abuse, right? There’s stuff on the butt. There’s stuff on the head, correct? A. Correct,
Q, None of that other stuff has anything to do with smothering; that’s correct, isn’t it?
A. That’s correct.
Q. This is the only picture [showing the abrasions and contusions under the infant’s lip], the only thing that led you to the conclusion it was a smothering, correct?
A. Yes.
[[Image here]]
Q. But other than*—I want to make sure I’m correct on this, and then I’ll get off this horse. Other than this (Indicating), hone of those other signs of possible abuse have anything to do with smothering; is that correct?
A. Smothering in and of itself, no.
Q. So this is it, right?
A. That’s it.
Indeed, the most that Dr. Traylor and Caddo Parish Coroner Dr. Todd Thoma could opine about these injuries is that this bruising was “consistent” with. smothering:
| ¡¡Those are the typical injuries that if you’re lucky enough to see with smothering other than possibly maybe a little abrasion to the tip of the nose from either a pillow or a sheet; you may see that. But typically, you know, it’s re *37 ferred to as a gentle homicide. Sometimes you don’t get any indication of the smothering at all. I think it’s fortunate that that was there in this particular case.
In State v. Wright, we determined that .such testimony on its own is not legally sufficient to sustain a conviction and to carry the State’s burden to prove specific intent beyond a reasonable doubt. 01-0322, p. 14 (La. 12/4/02), 834 So.2d 974, 986. Indeed, in Wright, the jury convicted the defendant of first-degree murder, finding, among other aggravating factors, that the defendant was engaged in the perpetration of an aggravated or forcible rape when he committed the murder of his girlfriend’s six-year-old daughter. Id., pp. 1-2, 834 So.2d at 978. Medical experts, after examining the victim’s vaginal and rectal areas, opined that the victim had been vaginally and anally penetrated. Id., pp. 13, 834 So.2d at 985-86. Nevertheless, they could not determine whether the injuries to the girl’s vaginal area were caused by a sexual assault or caused by the victim being catheterized. Id. Similarly, there was evidence the victim’s anus had been penetrated several times. Id. However, one expert could only opine that the injuries were “consistent with being penetrated by something anally,” while another could not identify the object that penetrated the child, responding affirmatively when asked whether it could have been “a finger, thumb, broomstick, mop handle stick ... [or] male penis.” Id., pp. 13-14, 834 So.2d at 986. This Court held that such testimony was not sufficient to sustain the State’s burden of proving specific intent:
While this strongly suggests that defendant sexually assaulted the victim, we cannot say that the state successfully proved beyond a reasonable doubt that the murder took place during the perpetration or attempted perpetration of an aggravated or forcible rape.
Id., p.14, 834 So.2d at 986 (emphasis added).
1 ¿While in Wright the Court ultimately determined there were sufficient other grounds to support the defendant’s conviction, including (but not limited to) the defendant’s admission that he regularly beat the child, the excess of 2,000 blood spatters across the victim’s home, the bloody children’s underwear and bloody towels hidden under the child’s bed, and the various lies and inconsistent statements the defendant gave to investigators,[1] the same is. not true here. Dr. Traylor and Dr. Thoma both admitted they based their entire conclusion that the infant was smothered to death on the bruising in his inner lips, which they both stated was “consistent with” smothering. The majority attempts to minimize this significant issue by arguing that, in rebuttal, “Dr. Traylor stated, that however he phrased his testimony during the state’s case-in-chief and under cross-examination, his unequivocal opinion was that ‘the death of the child is the result of asphyxia, secondary to smothering.’ ” Opn., p. 22. The problem with crediting this statement is that nothing in Dr. Traylor’s testimony or in his autopsy report provides an adequate factual basis for his conclusion or for his expressed certitude that smothering was the cause of the child’s death. Simply put, the only thing Dr; Traylor can state with certainty is that someone applied pressure to the infant’s mouth at some unspecified point and, critically, for some unspecifted period of time. He cannot say for how long the pressure was applied and he cannot relate the application of that pressure to the child’s death. Dr. Traylor’s testimony bears this out. On-direct examination in *38 the State’s case-in-chief, Dr. Traylor testified that the abrasions or contusions upon which he relied to arrive at his conclusion could have been caused by applied pressure to the infant’s mouth for a period of time that is much shorter than what would be necessary to suffocate the child:
|bQ. Taking State Exhibit 10 and State Exhibit 11 together, is it your opinion that those two photographs depict a condition of this baby that is, in your opinion, the result of applied pressure to the baby’s mouth against the teeth?
A. Yes.
Q. Dr. Traylor, in order to obtain that type of abrasion or contusion in the upper and lower lips, do you have an opinion about how long that pressure would have to be maintained against the child’s teeth?
A. Well, you could certainly cause that from—simply from several seconds worth of pressure. When I say “several seconds,” you know, ten, fifteen, twenty seconds, but in order to—you know, if the intent is to actually smother the child, it’s not like television. You don’t put your hand over somebody’s mouth and ten seconds later, they pass out. It actually takes a lot longer than that. So, you know, whether or not the individual that applied the pressure applied pressure forty-five seconds to a minute or whatever, but once the individual that the pressure is being applied to passes out, then they are not breathing anymore.
Q. So would it be your opinion that, the time it would take to cause death by smothering in an infant of this type would be in the forty-five second range or different?
A. Somewhere around there. Maybe a minute total, you know, to have cause the death, at least a minute or more.
Critically, to reach his conclusion that the cause of the child’s death was smothering, Dr. Traylor must assume “the intent is to actually smother the child.” The evidence of bilateral bruising under the child’s lips only indicates to him that someone placed pressure on the child’s mouth for “several seconds.. .you know, ten, fifteen, twenty seconds.” Dr. Traylor must assume, without any evidentiary support, that pressure was applied for a much longer period of time in order to arrive at the conclusion that the infant was smothered.
The problem is heightened by a dearth of evidence establishing defendant’s specific intent. Under the State’s theory of the case, specific intent was established because when defendant placed his hand over the infant’s mouth, he did so with the sole intention of smothering him to death. However, if the injuries to the inner lips are merely “consistent with” smothering, and other scenarios could not be | (¡excluded, then the State’s theory establishing the element of specific intent also collapses. That bruising was the only proof the State offered of specific intent, much like it was the only injury that led Drs. Thoma and Traylor to conclude the victim’s death was a homicide. Because the State offered no evidence to prove the injuries to the child’s inner lips were caused by—rather than “consistent with”—smothering, viewing the evidence in the light most favorable to the prosecution, the State failed to establish beyond a reasonable doubt that defendant acted with specific intent to kill the baby.
The other signs of abuse evident on the child cannot salvage the State’s case. Dr. Traylor’s autopsy revealed multiple indications of abuse—including, bruising to the infant’s forehead and both sides of his face, subcutaneous injuries to the infant’s scalp over the back and the front and behind the right ear, and subcutaneous hemorrhages *39 to the infant’s buttocks. Throughout trial, the State sought to plant the inference that defendant inflicted these injuries on the baby in the hours in which defendant was alone with the child immediately before his death. Significantly, however, although every witness who saw the infant on the evening of February 15, 2012, testified that they did not see any bruising on the child’s face before he went to bed, each of these witnesses also testified they never perceived any bruises on the child after he was found unresponsive in the defendant’s room. For instance, Abigail Crawford testified on direct examination during the State’s case-in-chief about the appearance of the infant after he was found unresponsive:
Q. And did you see any bruising on his face?
A. No, sir.
Q. And you got a good look at him?
|7A. I had a good look at him. I was looking because when he said something is wrong with Bobo I’m observing Bobo to see is any—you know, what is wrong with him.
Q. Okay. So you looked at his face.
A. I’m looking at him, I’m looking all over him.
Q. I mean, was the baby face up, you were holding by his—
A. Face up.
Q. —by his back?
A. Yes.
Q. So his face was facing your face?
A. Yes.
Q. And you saw no bruising about his forehead or his cheeks?
A. None.
Q. Did you see any scratch on the right side of his nose?
A. I did not.
Q. Okay. So no apparent injury to the child?
A. No.
Q. Correct?
A. Yes.
Given the dark pigmentation of the child’s skin, as evidenced in the autopsy photos, it is unsurprising that these bruises were not perceptible to anyone except the medical professionals who examined the infant after his death and the child’s mother who testified to seeing a bruise on the side of the child’s face when she brought clothes and a nose syringe for the infant over to the defendant’s house prior to the child’s last evening alive. If the bruises were not perceptible the evening before the child’s death, then the bruises could have been present for quite some time and could have been inflicted by any number of people, including the child’s mother with whom the child primarily lived. Because, as Dr. Tray-lor admitted* “[tjhere’s really no accurate way to date a bruise,” this evidence certainly is not sufficient to sustain the State’s burden of proving specific intent.
1 «Accordingly, although I concur in the majority’s conclusion the Batson error in this case would otherwise warrant vacation of defendant’s sentence and conviction, I dissent from the majority’s determination that the State presented sufficient evidence to meet its burden of proof. Thus, I would reverse and vacate defendant’s conviction and sentence and would dismiss the indictment.

. Id., pp. 11-12, 834 So.2d at 984-85.